**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KATHERINE WELCH**, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>**BASSETT HEALTHCARE NETWORK**, a New York not-for-profit corporation,<br><br>*Defendant.* | Case No. 5:26-cv-1852 (ECC/MJK)<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Katherine Welch ("Plaintiff"), at all times relevant herein, has been a patient of Bassett Healthcare Network ("Bassett Healthcare" or "Defendant"), and brings this class action lawsuit in her individual capacity and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions, her counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this case to address Bassett Healthcare's unlawful practice of disclosing Plaintiff's and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to third parties such as Alphabet Inc. ("Google") and others (collectively, "Unauthorized Parties"), without consent, through the use of tracking software that is embedded in Defendant's web properties.

2. Information about a person's physical and mental health is among the most confidential and sensitive information in our society, the mishandling of which can have serious consequences, including discrimination in the workplace or denial of insurance coverage.

3. Defendant owns and controls www.bassett.org ("Defendant's Website" or the "Website"), which it encourages patients to use for locating specific physicians, searching for medical services and conditions, browsing treatment facilities, communicating medical symptoms, conditions, and treatments via the search bar and related webpages.

4. The Website also contains the MyBassett Patient Portal, which Defendant encourages patients to register for and use in conjunction with their medical care.

5. Unbeknownst to its patients, Bassett Healthcare installed tracking technologies ("Tracking Tools") onto its Website.

6. Although Plaintiff is presently unaware of every type of pixel and tracking tool Bassett Healthcare deployed on its Website during the relevant time period, "Tracking Tools" refers to any technology that divulges confidential information to an unauthorized third party that: (1) has not executed a HIPAA-compliant business associate agreement with Defendant; and (2) for which patients did not execute a HIPAA-compliant marketing authorization.

7. As used herein, Tracking Tools includes: Google Analytics and similar tools offered by Google in conjunction with its marketing products and other platforms such as DoubleClick or Google Ads.

8. These Tracking Tools intercept, record, and disseminate patients' communications with Bassett Healthcare via its Website. Operating as designed, the Tracking Tools commandeer patients' web browsers and surreptitiously disclose their private communications to Google as they use the Website.

9. Plaintiff and Class Members used the Website to submit information related to their past, present, or future health conditions, including, for example, searches for specific health conditions and medical treatments, provider searches, facility location information, and free-text searches.

10. More specifically, Bassett Healthcare surreptitiously shared several types of private and protected patient information with Google, including but not limited to:

(a) Medical conditions, specialties, and services that users searched or selected through the Website's search bar, provider-search tool, and service pages;

(b) Provider-search criteria and preferences selected by users, including provider name, specialty or condition, virtual-visit availability, travel distance, accepted insurance, gender, and location;

(c) The names, specialties, locations, and other details of physicians and providers whose profile pages users viewed;

(d) The names and locations of medical facilities selected by users through provider-profile pages;

(e) Users' automatically-detected current locations, intended destinations, and related information transmitted when they selected the Website's "Get Directions" function;

(f) The exact words and phrases entered through the Website's free-text search function, together with the pages and medical services previously viewed or selected by the user;

(g) The URLs, page titles, and contents of webpages visited by users, including descriptive URLs and pages revealing the medical conditions, physicians, facilities, or treatments in which users expressed an interest;

(h) The dates, times, sequence, frequency, and duration of users' Website searches and interactions; and

(i) User-identifying information transmitted alongside those communications, including authenticated Google account-linked and browser-linked cookies, device information, and IP addresses.

11. The Private Information that Bassett Healthcare transmitted to Google reveals the fact that a particular individual is a patient seeking medical treatment, the type of medical care being sought, and other details concerning their medical care.

12. Indeed, Defendant used Tracking Tools to divulge Private Information from Users of its Website, like Plaintiff, for marketing, re-marketing, and analytics purposes, despite its express promise and acknowledgment that Bassett Healthcare "required by law to make sure that medical information that identifies [patients] is kept private.[1]

13. The information that Bassett Healthcare collected and disclosed via Tracking Tools is not anonymous. For example, Google "stores users' logged-in identifier on non-Google websites . . . in its logs. . . . Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such

[1] *Notice of Privacy Practice for Bassett Healthcare Network*, BASSETT HEALTHCARE NETWORK, https://www.bassett.org/patients-visitors/legal-documents/privacy-policy (last visited Sept. 21. 2026).

data (private and non-private) within the same logs and uses these data for serving personalized ads."[2] Google may also connect user data to IP addresses, which have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information.

14. Simply put, the information that Bassett Healthcare transmitted to Google is personally identifiable.

15. Bassett Healthcare is a healthcare entity and thus its disclosure of health and medical communications is tightly regulated. HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

16. In addition, as explained further below, HHS has specifically warned healthcare regulated entities that tracking technologies transmit personally identifying health information to third parties, both on the "public" portion of the website and within the password-protected patient portal, and that such information should not be transmitted without a HIPAA-compliant written authorization from patients.

17. The Federal Trade Commission ("FTC") has also warned hospitals and other entities that "even if you are not covered by HIPAA, you still have an obligation to protect against

---

[2] *See Brown v. Google LLC,* 685 F. Supp.3d 909 (N.D. Cal. 2023) (Order denying summary judgment and citing internal evidence from Google employees). Google may also connect user data to IP addresses, IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information.

impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."

18. Despite these clear laws and regulations, Bassett Healthcare has essentially planted a bug on patients' web browsers, which forcibly and invisibly discloses their private and confidential communications to Unauthorized Parties. This is the electronic equivalent of looking over the shoulder of each visitor for the entire duration of their website interaction.

19. Bassett Healthcare did not disclose the presence of these Tracking Tools to its patients and Website users.

20. Medical patients simply do not anticipate or expect that their trusted healthcare provider will send their private communications, PHI, or PII to Unauthorized Parties, let alone Google, which has a sordid history of privacy violations in the pursuit of ever-increasing advertising revenue.

21. Neither Plaintiff nor any other Class Member signed a written authorization permitting Bassett Healthcare to send their Private Information to Google.

22. Bassett Healthcare breached its statutory and common law obligations to Plaintiff and Class Members by, *inter alia*: (i) aiding and/or procuring the interception of Plaintiff's and Class Members' communications; (ii) failing to remove or disengage technology that was known and designed to share patients' information; (iii) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Google, or others; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Tracking Tools like Google Analytics; (v) failing to warn Plaintiff and Class Members; and (vi) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

23. As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) diminution of value of their Private Information; (iv) statutory damages; and (v) the continued and ongoing risk to their Private Information.

24. Plaintiff seeks to remedy these harms and bring causes of action for (1) violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), unauthorized interception, use, and disclosure; (2) breach of implied contract; (3) unjust enrichment; (4) breach of confidence/breach of fiduciary duty; (5) negligence; and (6) violation of New York Gen. Bus. Law § 349.

## PARTIES

25. Plaintiff Katherine Welch ("Plaintiff Welch") is a natural person and citizen of New York where she intends to remain.

26. Defendant Bassett Healthcare Network is a New York not-for-profit corporation headquartered in Cooperstown, New York, providing comprehensive healthcare to patients throughout Central New York.[3] The Bassett Healthcare Network is comprised of several hospitals and healthcare facilities, including but not limited to Bassett Medical Center, A.O. Fox Hospital, Little Falls Hospital, Valley Health Services, Cobleskill Regional Hospital, O'Connor Hospital, and First Community Care of Bassett.[4]

---

[3] *About Bassett Healthcare Network*, BASSETT HEALTHCARE NETWORK, https://www.bassett.org/about-us (last visited Sept. 21, 2026).

[4] *Id.*

27. Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160, 45 C.F.R. Part 162, and 45 C.F.R. Part 164 (HIPAA)).

## JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

29. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges violations of federal laws under the ECPA (18 U.S.C. § 2511, *et seq.*).

30. This Court has supplemental jurisdiction over Plaintiff's state-law and common-law claims under 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts as the federal claims.

31. This Court has personal jurisdiction over Defendant because its principal place of business is in Cooperstown, New York, which is within this District, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

32. Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant's principal place of business is in this District.

## FACTUAL ALLEGATIONS

### A. The U.S. Department of Health and Human Services and Federal Trade Commission Have Warned about Use of Tracking Tools by Healthcare Providers

33. In January 2013, HHS issued a final rulemaking notice regarding modifications to the HIPAA privacy, security, enforcement, and breach notification rules under the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act") to "strengthen the privacy and security protection for individuals' health information." 78 Fed. Reg. 5566 (January 25, 2013).

34. As part of that final rulemaking, which became effective on March 26, 2013, HHS stated that, to be considered PHI under HIPAA, information did "not necessarily [need to] include diagnosis-specific information, such as information about the treatment of an individual." 78 Fed. Reg. at 5598. Instead, "[i]f the information is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity, and therefore it must be protected in accordance with the HIPAA rules." *Id*.

35. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of Tracking Tools on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. **For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.**[5]

[5] *See* "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates", HHS (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-

36. In other words, HHS has expressly stated that entities like Defendant that implement Google Tracking Technologies and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-compliant authorization.

37. The HHS Bulletin further warned that:

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[6]

38. Additionally, HHS has warned healthcare providers that Protected Information is not limited exclusively to patient portals, and thus Defendant still has an obligation to protect information on non-password protected (i.e., "unauthenticated") webpages. Citing to the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity) ... relates to the individual's past, present, or future health or health care or payment for care."[7]

39. The HHS Bulletin went on to state:

> Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have

---

professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Sept. 21, 2026) (emphasis added).

[6] *See* Wayback Machine, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, HHS.gov (captured Jan. 6, 2023), https://web.archive.org/web/20230106134443/https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis added).

[7] *Id.*

> access to PHI in certain circumstances. **For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.**[8]

40. In addition, HHS and the FTC have recently issued a letter, once again admonishing entities like Defendant to stop using Tracking Tools:

> If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium. The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (e.g., tracking technology vendors) includes PHI ... Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule ... As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app. The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[9]

## B. Underlying Web Technology

41. To understand Defendant's unlawful data-sharing practices, it is important first to understand basic web design and tracking tools.

---

[8] *Id.* (emphasis added).

[9] *Re: Use of Online Tracking Technologies*, U.S. Dept. of Health & Hum. Servs. and Fed. Trade. Comm'n (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last visited June 02, 2026).

42. Devices (such as computer, tablet, or smart phone) access web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

43. Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

44. Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **Universal Resource Locator ("URL"):** a web address.
- **HTTP Request:** an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL, GET Requests can also send data to the host server embedded inside the URL, and can include cookies.
- **POST Requests**: the standard method by which a website transmits the information a user types into an online form — such as a name, email address, or message — from the user's browser to the website's server, distinguishing it from methods that display such data openly in the page's web address.
- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some

cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response:** an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[10]

45. Every website is comprised of "Markup" and "Source code." Source code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source code is essentially the back of the website, and the user does not see what happens in the source code.

46. Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests that are invisibly executed in the background without notifying the person using the web browser. For example, the Tracking Tools in this case are snippets of code that Defendant embedded in its Website's source code, thereby instructing the Website to send a second set of users' transmissions to Google's own web servers.

47. By contrast, the Markup is the façade of the website, and it is the only part that website visitors actually see when they access a website. As an example, a patient's HTTP Request seeks specific information from the Defendant's Website (e.g., the "Find a Doctor" page), and the HTTP Response provides the requested information in the form of "Markup," forming the webpage's content and features.

[10] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

### C. Bassett Healthcare's Use of Google's Tracking Tools

48. Tech companies like Google offer online Tracking Tools, including SDKs (software development kits) and tracking pixels,[11] to help drive ad revenue. Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, to direct more individuals to use Google's ad network and products, increasing Google's overall ad revenue.

49. Google's Tracking Tools are often offered for "free," when they are in fact a bartered exchange whereby Bassett Healthcare gets access to low-cost advertising and related analytics services in exchange for its patients' private data.

50. The Tracking Tools Bassett Healthcare installed enable advertisers and companies, including Bassett Healthcare, to benefit from Google's advertising ecosystem, and the data secretly collected from patients helps create targeted ads.

51. Bassett Healthcare essentially encourages patients to use a tapped device, and once the Website loads on the patient's browser, the software-based wiretap quietly waits for patients' private communications to trigger the tap, which then intercepts those communications and transmits them to Google.

52. Notably, transmissions only occur on webpages that contain Tracking Tools. Thus, Plaintiff's and Class Members' Private Information would not have been disclosed to Google via this technology but for Defendant's decisions to install the Tracking Tools on its Website.

---

[11] A tracking pixel is a script that runs in the background and collects information from the tracker about the user. The tracker pixel instructs the browser to send the users' IP address, along with identifying data such as cookies and device information to a third-party. This allows the tracker to monitor user activity and surreptitiously gain insight about the users' behavior on the site.

53. In addition to accessing and using the data intercepted from website users to provide its services, Google also uses the information intercepted by sites like Bassett Healthcare's to maintain and improve Google's own services, develop new services, measure the effectiveness of its advertising, and personalize content and ads that one sees on Google's and its partners' sites and applications. When combined with Google's vast data resources from its other products and services, the data collected by Google's Tracking Tools can contribute to comprehensive profiles of individuals that can be used for targeting advertisements and other commercial purposes.

54. Defendant does not disclose that its Website tracks, records, and transmits patients' Private Information to Google, and Plaintiff were not aware of this when they used the Website in conjunction with the ongoing medical care and treatment they received from Defendant.

55. Defendant never received written consent or written authorization to disclose Plaintiff's and Class Members' Private Information to Google via the Tracking Tools.

56. Defendant failed to provide meaningful notice to users that their health-related information would be transmitted to third parties for marketing and advertising purposes, and failed to obtain users' consent for such transmissions.

*i. The Google Analytics Tracking Tool*

57. One of these SDKs and tracking pixels that Bassett Healthcare has installed on its Website is Google Analytics. Google pitches Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[12] Google Analytics allows companies that utilize it to "understand how your customers interact across your sites and

---

[12] *Get Essential Customer Insights.*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited June 02, 2026).

apps, throughout their entire lifecycle," "take action to optimize marketing integrations across Google's advertising and publisher tools," and "quickly analyze your data with an easy-to-use interface and shareable reports."[13]

58. Google Analytics is incorporated into third-party websites, including Defendant's Website, by adding a small piece of JavaScript code to each page on the site. This code immediately intercepts a patient's interaction with the webpage every time the patient visits it, including what pages they visit and what they click on. The code also collects PII, such as cookies that identify specific individuals, device information, and more.

59. Once Google's software code collects the data, it packages the information and sends it to Google Analytics for processing. After the data has been processed and stored in the database, Google uses the data to generate reports, including reports on acquisition, engagement, and demographics.

60. Several different methods allow marketers and third parties to identify individual website users, but the examples below demonstrate what happens when the website user is logged into their Google account on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Tracking Tools. For example, the Pixel transmits the user's CID, thereby allowing Google to link the user's online communications and interactions to their Google Account.

61. In addition to using the data collection process mentioned above, Google Analytics sends requests to Google, along with unique identifier cookies (e.g., 3PSID, 3PAPISID, 3PSIDCC, and NID) to track behavior across websites and link it to advertising audiences and

[13] *Id.*

targeting signals. These cookies enable Google to create more comprehensive user profiles by connecting web activity to authenticated accounts.

62. Indeed, Google receives at least five cookies when Defendant's website transmits information via Google Analytics:

| Name | Value | Domain | Path | Ex... | Size | Htt... | Se... | Sa... | Pa... | Cr... | Pri... |
|---|---|---|---|---|---|---|---|---|---|---|---|
| __Secure-3PAPISID | M54-_D9WzuD... | .google.com | / | 20... | 51 | | ✓ | No... | | | High |
| __Secure-3PSID | g.a000CQnLu0... | .google.com | / | 20... | 167 | ✓ | ✓ | No... | | | High |
| __Secure-3PSIDCC | AKEyXzU5TpE... | .google.com | / | 20... | 91 | ✓ | ✓ | No... | | | High |
| __Secure-3PSIDTS | sidts-CjIBXMw... | .google.com | / | 20... | 94 | ✓ | ✓ | No... | | | High |
| NID | CqsDCAES3QI... | .google.com | / | 20... | 577 | ✓ | ✓ | No... | | | Me... |

*Figure 1. Screenshot from Bassett Healthcare's network traffic report for Google Analytics list of cookies sent out.*

63. The cookies listed in Figure 1 above are third-party cookies because they were created by Google and not Basset Healthcare. Although Google created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Google would not have received this data but for Defendant's implementation and use of the Pixel throughout its website.

64. The '3PSID,' '3PAPISID,' and '3PSIDCC' cookies are used to identify Defendant's patients by linking their browsing activity to their Google account. The values of these cookies are unique to each account holder and persist across sessions and devices.

65. When creating a Google account, users are required to provide an email address, meaning that the data collected alongside the '3PSID,' '3PAPISID,' and '3PSIDCC' cookies can be linked by Google to an identifiable email address. When registering for a Google Account, users also provide their full name, phone number, home address, work address, and a profile photograph.

66. Google can associate data collected alongside the cookies, not only with an email address, but also with a patient's name and other details, thereby allowing it to link a patient's private communications to their name and real world identity.

67. Once the Google Analytics tracker intercepts and processes the raw user data about "events," which may include personal and sensitive health-related information, it uses the 3PSID, 3PAPISID, and 3PSIDCC cookies to associate this data with unique user identifiers, from which it can link website interactions to individual user profiles and track users across multiple different websites, sessions, and devices when signed into their Google accounts.

68. The Google Analytics Tracker can also set a different type of cookie, known as the NID cookie, which is tied to the user's browser rather than to a named account. It still contains a unique identifier that persists for approximately six months, and the NID cookie enables Google to track user preferences, browsing behavior, and ad interactions across websites that use Google Analytics or serve Google Ads even if the user is not signed into a Google account on that browser. While the NID cookie does not reveal a named account identity, it still allows Google to build behavioral profiles and serve personalized advertisements based on a user's activity, including activity on websites such as Defendant's.

69. Defendant also revealed its website visitors' identities via first-party cookies such as the _ga cookie that google uses to identify a particular browser and a user.

| Name | Value | Domain | P... | Ex... | Size | H |
|---|---|---|---|---|---|---|
| _ga | GA1.2.1986861154.1... | .bassett.org | / | 20... | 30 | |
| _ga_6ME8RSJJE6 | GS2.1.s1790039558... | .bassett.org | / | 20... | 59 | |
| _gat_UA-9081496-1 | 1 | .bassett.org | / | 20... | 18 | |
| _gcl_au | 1.1.625213271.17900... | .bassett.org | / | 20... | 31 | |
| _gid | GA1.2.550048055.17... | .bassett.org | / | 20... | 30 | |

*Figure 2. Screenshot from Defendant's network depicting the first party cookie _ga.*

70. Importantly, the _ga cookie is transmitted to Google even when the user's browser is configured to block third-party tracking cookies because, unlike the NID and CID cookies, the _ga cookie functions as a first party cookie"—i.e., a cookie that was created and placed on the website by Defendant.[14]

71. Google's Privacy Policy expressly acknowledges its practice of tracking users, even when they are not logged in, via sites that have installed the Google Analytics Tracker. Per Google's own statement: "[w]hen you're not signed in to a Google Account, we store the information we collect with unique identifiers tied to the browser, application, or device you're using. This allows us to do things like maintain your preferences across browsing sessions, such as your preferred language or whether to show you more relevant search results or ads based on your activity."[15]

72. Defendant installed and configured Google Analytics on its Website. As a result, the Google Analytics tracking code is present on the pages of Defendant's web properties, including pages on which patients search for providers by specialty and name, view individual provider profiles, search for clinical services by location, browse medical condition information, and enter free-text queries into the Website's search bar. By installing Google Analytics, Defendant caused the '3PSID,' '3PAPISID' '3PSIDCC,' 'NID' and 'ga' cookies to be placed on patients' browsers, enabling Google to identify individual patients and link their health-related browsing activity to their Google accounts and real-world identities. Upon information and belief,

[14] *How Google Uses Cookies*, GOOGLE PRIV. & TERMS, https://policies.google.com/technologies/cookies?hl=en-US (last visited July 23, 2026)

[15] *See* Google, *Privacy Policy*, https://policies.google.com/privacy/embedded?hl=en-US (last accessed June 17, 2026).

Defendant has maintained Google Analytics on its Website continuously throughout the relevant time period.

*ii. The DoubleClick Tracking Tool*

73. Another of the Google SDKs and tracking pixels that Bassett Healthcare has installed on its Website is DoubleClick. DoubleClick is designed to collect information about user behavior on websites in order to improve the targeting and effectiveness of advertising campaigns. DoubleClick's tracking technologies (the "DoubleClick Tracker") automate the ad buying process and use collected data for targeted advertising initiatives.

74. Like Google Analytics, DoubleClick is incorporated into third-party websites, including Defendant's Website, by adding a small piece of JavaScript code to each page on the site. This code immediately intercepts a patient's interaction with the webpage every time the patient visits it, including what pages they visit and what they click on. The code also collects PII, such as cookies that identify specific individuals, device information, and more.

75. The DoubleClick Tracker distinguishes itself from Google Analytics in that it specifically focuses on advertising functionality. Once Google's software code collects the data, it packages the information and sends it to Google for processing. After the data has been processed and stored in the database, it is used to enable ad retargeting, which allows Bassett Healthcare to display targeted advertisements to users on other websites based on their previous interactions with the Website.

76. Also like the Google Analytics Tracker, the DoubleClick Tracker can collect data on user interactions with a website and transmit these details to Google. These interactions may include page views, clicks, form submissions, video plays, and other custom-defined actions.

While Google Analytics refers to these as “events,” the DoubleClick Tracker generally tracks them as “conversions” or “activities,” primarily for advertising and attribution purposes.

77. Through the DoubleClick Tracker, Google creates and assigns unique identifiers to website visitors, including through the IDE cookie and, upon information and belief, the DSID cookie. The IDE cookie is a persistent advertising identifier containing a string of numbers and letters. The IDE cookie is unique to each user’s browser and is used to record user actions and measure ad effectiveness. This identifier can be associated with a user’s browser or device over extended periods of time. The DSID cookie is an account-linked identifier that is set when a user is logged into a Google account. It links browsing activity on non-Google websites to the user’s Google account and ensures that the user’s ad personalization settings are applied and respected across non-Google sites. The cookies contain unique user identifiers that enable Google to connect user behavior across different websites, devices, and browsing sessions.

78. The DoubleClick Tracker also collects and stores IP addresses in server logs. An IP address is a globally unique numerical identifier that guides or routes communications across the Internet. Internet service providers assign IP addresses to networking devices such as modems or routers.

79. IP addresses function as the essential addressing system of the internet. Just as a telephone number routes calls to the correct household, an IP address is necessary for routing internet communications to the correct location. Importantly, IP addresses reveal the general geographic location of internet users. Free online “IP lookup” services use databases that map IP addresses to geographic areas and potentially specific households, often providing information about the country, city, county, approximate coordinates, or even the internet service provider associated with the address.

80. The geolocation capability of IP addresses makes them extraordinarily valuable for digital advertising and tracking. IP addresses allow companies to target advertisements to users in specific geographic areas with over 95% accuracy and track user interactions across multiple websites, building detailed profiles of users' browsing habits tied to their location.

81. IP addresses are particularly powerful when combined with persistent identifiers like the IDE cookie. When individuals use their devices across different locations (home, work, coffee shops), each location has its own IP address. By tracking these movement patterns between different IP addresses and correlating them with a cookie, Google can build detailed profiles of individual users' daily routines and behaviors that distinguish them from others who may share the same IP address. This combination of cookies and IP address patterns allows Google to identify and track specific individuals with remarkable precision, even when multiple people share the same household or workplace network.

82. For these reasons, Europe's General Data Protection Regulation ("GDPR") classifies IP addresses as "personal data," recognizing that even data that has been de-identified or pseudonymized but can be used to re-identify a person remains personal data. When Google combines IP addresses with the IDE cookie and the sensitive health information intercepted from the Website, it creates a comprehensive digital profile that can identify specific individuals and their medical interests.

83. The DoubleClick Tracker also works in concert with Google's vast advertising network, which spans millions of websites. This means that the scope and impact of the interception facilitated by Bassett Healthcare extends far beyond the Website, potentially affecting users' experiences across the entire Internet ecosystem. When combined with Google's other data

sources, the information intercepted through the DoubleClick Tracker enables even more precise identification and tracking of individuals.

84. Upon information and belief, Google combines the sensitive health information intercepted through the DoubleClick Tracker with other data points in its possession (including data points obtained through the Google Analytics Tracker) to create comprehensive user profiles that include intimate details about individuals' medical conditions, treatment interests, and healthcare-seeking behaviors. These profiles can then be monetized through targeted advertising that may reveal or allude to users' private health concerns.

85. Defendant installed and configured the DoubleClick Tracker on its Website. As a result, the DoubleClick tracking code was present on pages through which patients searched for providers by specialty and name, viewed individual provider profiles, located medical facilities, searched for clinical services and medical conditions, and entered free-text queries. By installing the DoubleClick Tracker, Defendant caused patients' page views, clicks, searches, and other Website communications to be transmitted to Google together with user-identifying information, including the IDE and DSID cookies and users' IP addresses. Upon information and belief, Defendant maintained the DoubleClick Tracker on its Website throughout the relevant period.

**D. Bassett Healthcare's Dissemination of Patient Information Via Its Website**

86. Through its Website at www.bassett.org, users are able to search for doctors and medical conditions. Users communicate their private and personal information via the site, including protected health information. Unbeknownst to users, Bassett Healthcare is surreptitiously sharing with Google their private and protected information without their consent. The following are illustrative examples of the types of private information that Bassett Healthcare's Tracking Tools intercept and transmit to Google.

### *i. Bassett Healthcare Homepage*

87. When patients enter the homepage of the site, the Tracking Tools immediately started firing and surreptitiously captured patients' online activities and communications such that they were received by Google and other Unauthorized Parties.




*Figure 3. Screenshot from homepage showing Defendant's tracking tools firing to Google.*

### *ii. User Searches for a Doctor*

88. Upon landing on the Bassett Healthcare homepage on the Website (www.bassett.org), users can reach the "Find a Doctor" page either through the link in the top navigation bar or by selecting the "Find a Doctor" option displayed on the homepage.

89. On the "Find a Doctor" page, users can search for a provider using the search bar at the top of the page by entering a name, specialty, or condition. They can further refine the results using filters such as virtual visit availability, travel distance, insurance accepted, gender, and location. This information entered by the user on the Find a Doctor page is transmitted to Google by the Tracking Tools, along with the related cookies.

90. For example, a user searching for a male urology provider who offers virtual visits, provides services within 35 miles of the user's location, and accepts all insurance will turn up results for two urologists within the network.




*Figure 3. Screenshot from Defendant's "Find a Doctor Tool" with the filters applied to the search as described above.*

91. All those filter choices are transmitted in real time to Google, along with user-identifying cookies, via both the Google Analytics Tracker and the DoubleClick Tracker. The Google Analytics Tracker transmits this information together with the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies, while the DoubleClick Tracker transmits the same information together with the IDE and DSID cookies and the user's IP address.




*Figures 4. Screenshot from Defendant's "Find a Doctor Tool" showing the results of the filtered search on the left and the source code on the right showing the descriptive URL that Defendant retained.*




*Figure 5. Screenshot from Defendant's "Find a Doctor Tool" showing the results of the filtered doctor search appearing on the left, and the DoubleClick cookies firing simultaneously on the right in connection with that same search.*




*Figure 6. Screenshot from Defendant's "Find a Doctor Tool" showing the results of the filtered doctor search appearing on the left, and the Google Analytics third party cookies firing simultaneously on the right in connection with that same search.*

92. When a user selects a specific provider's profile page, Google receives information about the page the user entered, along with the doctor's details and any selected preferences. For example, after filtering the provider list based on selected preferences, a user who opened Dr. Raymond J. McGoldrick's profile caused Google to receive the filtered results page along with the doctor's details. This information was transmitted via both the Google Analytics Tracker (with the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies) and the DoubleClick Tracker (with the IDE and DSID cookies and the user's IP address).




*Figure 7. Screenshot from Dr. McGoldrick's page appearing on the left, which the user arrived to following the filtered doctor search. On the right, showing Defendant's source code transmitting this user's visit to Dr. McGoldrick's page to Google Tag Manager.*

### *iii. User Explores a Specific Medical Facility*

93. Providers' profile pages include a list of "Locations Where I Practice", and users can click the listed locations to view the medical facility associated with the provider. When users take this action, the name and location of the clicked facility is transmitted in real time to Google, together with the provider's name and details, via both the Google Analytics Tracker (with the 3PSID, 3PAPISID, 3PSIDCC, NID, and _ga cookies), and the DoubleClick Tracker (with the IDE and DSID cookies and the user's IP address).




*Figure 8. Screenshot from Defendant's Website showing the user looking into A.O. Fox Hospital on the left, and the Google Analytics third party cookies firing simultaneously on the right in connection with that same search.*




*Figure 9. Screenshot from Defendant's Website showing the user looking into A.O. Fox Hospital on the left, and the DoubleClick cookies firing simultaneously on the right in connection with that same search.*

94. Additionally, the medical facility page includes a "Get Directions" hyperlink which, when clicked, redirects users to Google Maps pre-filled with the user's automatically-detected current location as the starting point and the facility's name and address as the destination. This action is intercepted by the Tracking Tools. For example, directions are generated from the user's automatically determined current location to Bassett Medical Center, located at 1 Atwell Road, Cooperstown, New York, and that information is transmitted in real time to Google via both the Google Analytics Tracker (with the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies) and the DoubleClick Tracker (with the IDE and DSID cookies and the user's IP address).

***iv. User Searches for a Medical Service***

95. From the Website's top navigation bar, a user can access the "Services" page to reach the service finder page. On this page, the user can browse the listed medical services and then click a specific service to navigate to the page with information relating to that service. The name of any service clicked by the user on this page is transmitted to Google. For example, where a user selects "Cancer Care," the name of this page is transmitted in real time to Google via the Google Analytics Tracker (with user-identifying cookies including 3PSID, 3PAPISID, 3PSIDCC, and NID) and via the DoubleClick Tracker (with user-identifying cookies including the IDE cookie and the user's IP address).




*Figure 10. Screenshot from Defendant's Website showing the user using the services tab to click Cancer Care on the left, and the Google Analytics request URL on the right, transmitting to Google that the user had viewed the Cancer Care Page.*




*Figure 11. Screenshot from Defendant's Website showing the user using the services tab to click Cancer Care on the left, and the Google Analytics cookies firing simultaneously on the right.*

### *v. User Conducts a Free-Text Search*

96. When a user conducts a free-text search using the Website's search field, the exact search term is transmitted in real time to Google. For example, the search term "HIV," as entered by a user, along with the user's prior selection of the "Cancer Care" service, is transmitted to Google via the Google Analytics Tracker (together with user-identifying information including the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies) and via the DoubleClick Tracker (together with user-identifying information including the IDE and DSID cookies and the user's IP address).




*Figure 12. Screenshot from Defendant's Website showing the user's search for "HIV" being transmitted to Google on the right, and also noting the prior page view for Cancer Care.*

### *vi. Temporal Patterns and Behavioral Analysis*

97. In addition to the content of searches and interactions, the Google Analytics and DoubleClick Tracking Tools also collect timestamp data showing precisely when each interaction occurs. This temporal information reveals behavioral patterns about users' healthcare-seeking activities. The timestamp data enables Google to determine: (a) the complete progression of users' journeys through the Website, revealing potential connections between search terms, doctors'

pages viewed, and conditions researched; (b) the evolution of users' health journeys by tracking the sequence and timing of searches from initial symptoms to specific conditions to treatment options; (c) the urgency of users' health concerns based on search times; (d) the frequency and regularity of health-related searches, distinguishing between chronic condition management and acute health crises; (e) the duration users spend researching specific conditions, indicating their level of concern or the severity of their situation; and (f) patterns that may reveal work or life impacts of health conditions based on when searches occur.

## E. Plaintiff's Experiences

### *i. Plaintiff Katherine Welch*

98. Plaintiff Welch, as a patient of Bassett Healthcare, has paid for and received healthcare services from Bassett for approximately eleven years. Throughout those 11 years, she used the Website frequently in connection with her treatment, including but not limited to searching for doctors, making appointments, obtaining prescriptions, and logging into the patient portal. Plaintiff most recently used the website this month.

99. Plaintiff Welch has used the Website to search for doctors, used its locations tool to find a clinic location, used the "Find a Service" tool, engaged in immediate care video visits, searched the care and services page for treatments, symptoms, and conditions, conducted free-text searches for treatments, symptoms, and conditions, clicked the link to the patient portal, and logged into the patient portal.

100. Plaintiff Welch accesses the Website through Google Chrome on her personal Android tablet and her personal Windows PC. She has been signed into her Google account on Google Chrome while using the Website.

101. Because Defendant utilized Tracking Tools on the Website, Google intercepted and received Plaintiff Welch's sensitive Private Information and electronic communications without her knowledge or consent.

***ii. Plaintiff's Injuries***

102. As Defendant's patient, Plaintiff Welch reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted to or disclosed to Unauthorized Parties. But for her status as Defendant's patient, Plaintiff would not have disclosed their Private Information to Defendant via its Website.

103. As Defendant's patient, Plaintiff would never consent to the use of her Private Information by Unauthorized Parties or to Defendant, enabling Unauthorized Parties such as Google to access or interpret such information.

104. During the same transmissions, the Website routinely provided Unauthorized Parties with its patients' IP addresses, device IDs, cookies linked to authenticated user accounts, and/or other information they input into Defendant's Website, like their home address, zip code, or phone number. This is precisely the type of information that HIPAA requires healthcare providers to anonymize to protect the privacy of patients. The information that Google received from Bassett, including Plaintiff's and Class Members' communications, was not anonymous.

105. After intercepting and collecting this information, Google processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. Because Plaintiff is a Google user who remained signed into her Google account while using the Website, Google is able to identify her.

106. In sum, Defendant's Tracking Tools transmitted Plaintiff's highly sensitive communications and Private Information to Google and other Unauthorized Parties, including communications that contained private and confidential information, without Plaintiff's knowledge, consent, or express written authorization.

107. Plaintiff suffered injuries in the form of (i) invasion of privacy; (ii) diminution of value of the Private Information; (iii) statutory damages; (iv) the continued and ongoing risk to their Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff's medical conditions and other confidential information she communicated to Defendant via the Website.

108. Plaintiff has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure, and she also has an interest in knowing which Unauthorized Parties, aside from Google, have received her PII and PHI since she first started using the Website.

## F. Defendant's Conduct Is Unlawful and Violated Industry Norms

### *i. Defendant Violated HIPAA Standards*

109. Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[16]

110. The HIPAA Privacy Rule, located at 45 C.F.R. Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health

[16] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[17]

111. The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

112. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

113. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

---

[17] HHS.gov, HIPAA For Professionals, https://www.hhs.gov/hipaa/forprofessionals/privacy/index.html (last visited June 06, 2026).

> A. Names;
>
> ***
>
> H. Medical record numbers;
>
> ***
>
> J. Account numbers;
>
> ***
>
> M. Device identifiers and serial numbers;
>
> N. Web Universal Resource Locators (URLs);
>
> O. Internet Protocol (IP) address numbers; … and
>
> R. Any other unique identifying number, characteristic, or code. …; and …
>
> The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

114. The HIPAA Privacy Rule requires any "covered entity," which includes health care providers, to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

115. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained

by a covered entity and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

116. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

117. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

118. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data... If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[18]

[18] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited June 03, 2026).

119. In its guidance for Marketing, the HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. ... Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list.* (emphasis added).[19]

120. As alleged above, there is an HHS Bulletin that highlights the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using tracking technologies.[20]

121. The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

122. Defendant's actions violated HIPAA Rules per this Bulletin.

***ii. Defendant Violated Industry Standards***

123. A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

---

[19] *Marketing*, OCR HIPAA Privacy (Dec. 3, 2002), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited June 12, 2026) (emphasis added).

[20] *See* HHS.gov, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 12, 2026).

124. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

125. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care . . . Patient privacy encompasses a number of aspects, including, . . . personal data (informational privacy).

126. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

127. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically … must …. : (c) release patient information only in keeping with ethics guidelines for confidentiality.

### G. Plaintiff's and Class Members' Expectation of Privacy

128. Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

129. Indeed, at all times when Plaintiff and Class Members provided their Private Information to Defendant, they each had a reasonable expectation that the information would

remain private and that Defendant would not share the Private Information with Unauthorized Parties for a commercial purpose unrelated to patient care.

130. Plaintiff and Class Members would not have used Defendant's Website, would not have provided their Private Information to Defendant, and would not have paid for Defendant's healthcare services, or would have paid less for them, had they known that Defendant would disclose their Private Information to Unauthorized Parties.

**H. IP Addresses and Identifying Cookies Are PII**

131. Defendant's use of Tracking Tools disclosed and otherwise assisted Unauthorized Parties with intercepting Plaintiff's and Class Members' IP addresses, identifying cookies, and other persistent identifiers.

132. An IP address is a number that identifies the address of a device connected to the Internet, and it is used to identify and route communications on the Internet.

133. Under HIPAA, an IP address is considered PII.

134. HIPAA also defines PII to include "any unique identifying number, characteristic or code," and the identifying cookies that Google received in this case fall within this category of PII. *See* 45 C.F.R. § 164.514.

135. Consequently, Defendant's practice of divulging patients' Private Information to Google via the Tracking Tools violates HIPAA and industry privacy standards.

**I. Defendant Was Enriched and Benefitted from the Use of the Tracking Tools and Unauthorized Disclosures**

136. The primary motivation and a determining factor in Defendant's interception and disclosure of Plaintiff's and Class Members' Private Information was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of patient data

for advertising in the absence of express written consent. Defendant's further use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy. In exchange for disclosing the Private Information of its patients, Defendant is compensated by Google in the form of enhanced advertising and analytics services and more cost-efficient marketing on its platform.

137. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients to get more patients to use its services. Defendant did so through use of the intercepted patient data it obtained, procured, and/or disclosed in the absence of express written consent.

138. By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiff and Class Members and violating their rights under federal and state law.

**J. Plaintiff's and Class Members' Private Information Had Financial Value**

139. Plaintiff's data and Private Information have economic value. Google has recognized the value of user data and has even instituted a pilot program in which it pays users $3 per week to track them online.

140. Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

141. The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[21]

142. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[22]

143. Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[23]

144. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying

---

[21] *See* How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry, TIME (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/ (last visited Sept. 21, 2026).

[22] *See Hospital Execs Say They Are Getting Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html?msockid=35128af7e8496ed33a159d44e9256f5b (last visited Sept. 21, 2026).

[23] Vero, *How To Collect Email Addresses On Twitter*, https://www.getvero.com/resources/twitter-lead-generation-cards/ (last visited Sept. 21, 2026).

information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.”).

145. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

146. Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a “Facebook Research” app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

## TOLLING

147. Any applicable statute of limitations has been tolled by the “delayed discovery” rule.

148. Shortly before this complaint was filed, Plaintiff, through the investigation of undersigned counsel, learned about Defendant’s unlawful disclosure and transmission of her Private Information to third parties, such as Google, in the manner described herein.

149. Prior to that date, Plaintiff did not know (and had no way of knowing) that their Private Information was intercepted and unlawfully disclosed to Google because Defendant kept this information secret and the Tracking Tools are invisible on the Website.

## CLASS ACTION ALLEGATIONS

150. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

151. The Class that Plaintiff seek to represent is defined as follows:

> All individuals residing in the United States who are, or were, patients of Defendant or any of its affiliates, who used Defendant's Website in conjunction with their medical care.

152. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

153. Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

154. Numerosity, Fed. R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI may have been improperly disclosed via Defendant's Tracking Tools, and the Class is identifiable within Defendant's records.

155. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

(a) Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

(b) Whether Defendant had a duty not to disclose its patients' Private Information to Unauthorized Parties;

(c) Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to Google for marketing purposes;

(d) Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been divulged;

(e) Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

(f) Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

(g) Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

(h) Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

156. Typicality, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use of Tracking Tools, due to Defendant's misfeasance.

157. Adequacy, Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained

counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

158. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for the fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

159. Policies Generally Applicable to the Class. Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

160. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would

necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

161. The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

162. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

163. Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

164. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

165. Issue Certification, Fed. R. Civ. P. 23(c)(4). Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the

resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

(a) Whether Defendant has a legal duty to not disclose Plaintiff's and Class Members' Private Information to companies that have not executed a HIPAA-compliant business associate agreement;

(b) Whether Defendant has a legal duty to not disclose Plaintiff's and Class Members' Private Information without first obtaining their express authorized consent;

(c) Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

(d) Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

(e) Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to Google;

(f) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information communicated via its Website;

(g) Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**COUNT I**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT (“ECPA”)**
**18 U.S.C. § 2510, *et seq.***
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On behalf of Plaintiff and the Class)**

166. Plaintiff repeats the allegations contained in all foregoing paragraphs as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

167. The ECPA protects both sending and receipt of communications.

168. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

169. The transmissions of Plaintiff’s Private Information to Defendant via Defendant’s Website qualify as a “communication” under the ECPA’s definition in 18 U.S.C. § 2510(12).

170. **Electronic Communications.** The transmission of Private Information between Plaintiff and Class Members and Defendant via its Website with which they chose to exchange communications are “transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce” and are therefore “electronic communications” within the meaning of 18 U.S.C. § 2510(2).

171. **Content**. The ECPA defines content, when used with respect to electronic communications, to “include any information concerning the substance, purport, or meaning of that communication.” 18 U.S.C. § 2510(8).

172. **Interception**. The ECPA defines the interception as the “acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic,

mechanical, or other device" and "contents include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

173. **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

(a) Plaintiff's and Class Members' browsers;

(b) Plaintiff's and Class Members' computing devices;

(c) Defendant's web-servers; and

(d) The Tracking Tools deployed by Defendant to effectuate the sending and acquisition of patient communications.

174. By utilizing and embedding Tracking Tools on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

175. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via Tracking Tools, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to Unauthorized Parties including Google.

176. These intercepted communications include, but are not limited to, communications to/from Plaintiff's and Class Members' that contain PII and PHI.

177. By intentionally disclosing or endeavoring to disclose the electronic communications of the Plaintiff and Class Members to Unauthorized Parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

178. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

179. **Unauthorized Purpose.** Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State, namely, violation of HIPAA (42 U.S.C. § 1320d-6), among others.

180. Defendant intentionally used the wire or electronic communications to increase its profit margins. For example, this not only bolstered its marketing efforts, it allowed Defendant to use free and/or low-cost analytics tools in lieu of HIPAA-compliant business and marketing solutions.

181. In doing so, Defendant specifically used the Tracking Tools to track and utilize Plaintiff's and Class Members' Private Information for financial gain.

182. Defendant was not acting under color of law to intercept Plaintiff and the Class Members' wire or electronic communications.

183. Plaintiff and Class Members did not authorize Defendant to acquire the contents of their communications for purposes of invading Plaintiff's privacy via the Tracking Tools.

184. Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

185. In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious and designed to violate federal and state legal provisions, and also constitutes a knowing

intrusion into a private place, conversation, or matter that would be highly offensive to a reasonable person.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

186. Plaintiff repeats the allegations contained in all foregoing paragraphs as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

187. As a condition of utilizing Defendant's digital platforms and receiving services from Defendant, Plaintiff and the Class provided their Private Information and compensation for their medical care.

188. When Plaintiff and Class Members provided their Private Information to Defendant, they entered into implied contracts pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

189. Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

190. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information to Unauthorized Parties. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

191. Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

**COUNT III**
**UNJUST ENRICHMENT**

**(Alternative to Count II, On Behalf of Plaintiff and the Class)**

192. Plaintiff repeats and realleges the allegations of the preceding paragraphs as though fully set forth herein, except to the extent inconsistent with this Count. Pursuant to Federal Rule of Civil Procedure 8(d), Plaintiff asserts this Count for unjust enrichment in the alternative to Count II for breach of implied-in-fact contract, individually and on behalf of the proposed Class, in the event the Court determines that no enforceable contract governs the subject matter of the parties' dispute.

193. Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

194. Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

195. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

196. The benefits that Defendant derived from Plaintiff and Class Members were not offered by Plaintiff and Class Members gratuitously and rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in New York and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

197. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**COUNT IV**
**BREACH OF CONFIDENCE/BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Class)**

198. Plaintiff repeats the allegations contained in all foregoing paragraphs as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

199. Medical providers have a duty of confidentiality to their patients to keep non-public medical information completely confidential, and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

200. As a fiduciary of the Private Information and medical provider, Defendant further owed Plaintiff and Class Members a duty of loyalty that precluded the misuse and misappropriation of Plaintiff's and Class Members Private Information.

201. In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became a guardian of Plaintiff's and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; and (2) to only use the information for the authorized purpose.

202. Plaintiff and Class Members had reasonable expectations of privacy in their Private Information and the related confidential communications exchanged with Defendant through the Website.

203. Plaintiff and Class Members also reasonably expected that their Private Information would only be utilized for medical purposes.

204. Plaintiff and Class Members did not provide consent for Defendant to appropriate or use their Private Information for commercial and digital marketing purposes.

205. Contrary to its duties as a fiduciary and medical provider and its express and implied promises of confidentiality, Defendant installed Tracking Tools with the intent and purpose to disclose and transmit Plaintiff's and Class Members' Private Information to Google and Meta.

206. The unauthorized disclosures of Plaintiff's and Class Members' Private Information were intentionally caused by Defendant's employees acting within the scope of their employment with the purpose of marketing for new patients. Alternatively, the disclosures of Plaintiff's and Class Members' Private Information occurred because of Defendant's negligent hiring or supervision of its employees, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees to properly discharge their duties under existing privacy policies and procedures.

207. Defendant's breach of its fiduciary duties implied covenants of trust, loyalty, and confidence is evidenced by its failure to comply with federal and state privacy regulations, including:

(a) Failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

(b) Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding

individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

(c) Failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

(d) Failing to obtain satisfactory assurances, including in writing, that its business associates and/or subcontractors would appropriately safeguard Plaintiff's and Class Members PHI;

(e) Impermissibly and improperly using and disclosing PHI for marketing in violation of 45 C.F.R. § 164.502, *et seq.*;

(f) Failing to hire an expert to review the risk of data sets for re-identification and further failing to remove all digital identifiers from the data sets before disclosing the Private Information in violation of 45 C.F.R. § 160.103.

(g) Failing to effectively train all members of its workforce, namely its digital marketing department and regulatory department on the policies and procedures with respect to PHI as necessary and appropriate for the members of its staff to carry out their responsibilities to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5);

(h) Failing to keep Private Information confidential as required by N.Y. C.P.L.R. 4504;

(i) Failing to keep Private Information confidential as required by N.Y. Pub. Health Law § 2803(3)(f);

(j) By otherwise failing to safeguard Plaintiff's and Class Members' Private Information; and

(k) By otherwise misusing and unjustly profiting from Plaintiff's and Class Member's Private Information.

208. As a direct and proximate result of Defendant's breach of fiduciary duty and confidentiality, Plaintiff and Class Members have suffered numerous harms and injuries, including invasion of privacy, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

209. Consequently, Plaintiff, individually and on behalf of the putative Class, seeks the following damages: compensatory, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), and in the alternative, nominal. Plaintiff further seeks restitution, disgorgement of profits or cost savings obtained from the improper use of the Private Information. Finally, Plaintiff seeks injunctive relief to address the ongoing breach of the fiduciary duty and financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

## COUNT V
## NEGLIGENCE
## (On behalf of Plaintiff and the Class)

210. Plaintiff repeats and realleges the above paragraphs as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

211. Defendant owed Plaintiff and Class Members a duty to keep their Private Information completely confidential, and to safeguard sensitive personal and medical information.

212. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed Tracking Technologies to disclose and transmit to third parties

Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

213. These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

214. While Defendant intentionally implemented the Tracking Tools, Defendant was unaware of that the Tracking Tools were capable to collecting personally identifiable information that constituted personal health information.

215. It was highly foreseeable that the world's most sophisticated digital marketing companies at issue here would be able to connect the website data related to past, present, and future medical care with specific individuals.

216. Defendant was negligent in one or more of the following ways:

(a) Failing to hire outside experts to review the marketing plan to ensure all identifiers were removed;

(b) Failing to remove all identifiers as advised by HIPAA regulations;

(c) Failing to test its marketing systems for level of entropy that could be used to identify individuals;

(d) Failing to adequately train its digital marketing team on data privacy standards and policies;

(e) Failing to recognize the connection between its targeted marketing campaigns an ecosystem capable of identifying individuals who visited the Website;

(f) Being otherwise negligent.

217. As a direct and proximate result of Defendant's breach, Plaintiff and Class Members sustained numerous injuries including but not limited to the, invasion of privacy, loss of

control of their Private Information, misappropriation and misuse of their Private Information, breach of confidentiality, conversion, and ongoing financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

218. Consequently, Plaintiff, individually and on behalf of the putative Class seeks legal and equitable remedies to address and rectify the negligence described herein including compensatory and consequential damages, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), and in the alternative nominal damages. Plaintiff further seeks restitution and disgorgement of profits or cost savings obtained from the improper use of the Private Information. Finally, Plaintiff seeks injunctive relief to prevent the ongoing disclosure, interception, and continued misuse of the Private Information.

## COUNT VI
## VIOLATIONS OF THE NEW YORK CONSUMER LAW FOR DECEPTIVE ACTS AND PRACTICES GEN. BUS. LAW § 349
**(On behalf of Plaintiff and the Class)**

219. Plaintiff repeats and realleges above as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

220. This cause of action is brought pursuant to the New York General Business Law § 349 ("NYGBL"), which New York courts have invariably interpreted using the kind of liberal construction afforded to state consumer protection statutes intended to prevent fraud.

221. NYGBL § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

222. By reason of the conduct alleged herein, Defendant engaged in unlawful practices within the meaning of NYGBL § 349. The conduct alleged herein is a "business practice" within the meaning of NYGBL § 349, and the deception occurred within New York State.

223. By serving as Plaintiff's and Class Members' healthcare provider, Defendant had a duty to protect their Private Information from unlawful disclosure.

224. Plaintiff and the Class Members paid for or otherwise availed themselves and received services from Defendant, for the purpose of medical treatment.

225. Defendant engaged in the conduct alleged in this Class Action Complaint, entering into transactions intended to result, and which did result, in the provision of medical treatment to Plaintiff and Class Members.

226. Defendant's acts, practices, and omissions were done in the course of Defendant's offer of medical treatment, services, and care throughout the state of New York.

227. The unfair, unconscionable, and unlawful acts and practices of Defendant alleged herein, and in particular the decisions regarding the Tracking Tools emanated and arose within the state of New York, within the scope of NYGBL § 349.

228. Defendant, operating in and out of New York, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of NYGBL § 349, including but not limited to the following: (a) knowingly promising to protect Plaintiff's and Class Members' Private Information, (b) knowingly and improperly storing, possessing, using, and/or procuring the interception of, Plaintiff's and Class Members' Private Information; and (c) knowingly disclosing Plaintiff's and Class Members' Private Information to third parties, including Facebook.

229. Defendant committed these acts while concurrently representing that it would protect and not unlawfully disclose Plaintiff's and Class Members' Private Information unless under a legal obligation to do so.

230. These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including but not limited to HIPAA, the New York Patient's Bill of Rights, New York computer crime statutes, statutes regarding the confidentiality of medical records, and NYGBL § 349.

231. Defendant knew or should have known that its Website and the cookies and source code thereon were unlawfully wiretapping, intercepting, and disclosing Plaintiff's and Class Members' Private Information.

232. Plaintiff has standing to pursue this claim because as a direct and proximate result of Defendant's violations of NYGBL § 349, Plaintiff and Class Members have been "aggrieved" by a violation of NYGBL § 349 and bring this action to obtain a declaratory judgment that Defendant's acts or practices violate NYGBL § 349.

233. Plaintiff also has standing to pursue this claim because, as a direct result of Defendant's knowing violation of NYGBL § 349, Plaintiff and Class Members have lost money or property in the form of monies paid for Defendant's services, diminution in value of their Private Information, as well as loss of the benefit of their bargain with Defendant.

234. Plaintiff and Class Members are entitled to injunctive relief to protect them from the substantial and imminent risk of future loss of Private Information, including, but not limited to: (a) ordering that Defendant immediately remove any pixel, web beacon, cookie, or other tracking technology that causes the disclosure of Private Information to third parties without consent; (b) ordering that Defendant engage third-party security auditors and internal personnel to ensure Plaintiff's and Class Members' Private Information is no longer subject to the unlawful practices described in this Complaint; (c) ordering that Defendant purge, delete, and destroy Private Information not necessary for its provisions of services in a reasonably secure manner;

(d) ordering that Defendant conduct regular database scans and security checks; (e) ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to properly handle Private Information provided via Defendant's Website; (f) ordering Defendant to meaningfully educate individuals about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps victims should take to protect themselves.

235. Plaintiff brings this action on behalf of herself and Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff, Class Members, and the public from Defendant's unfair methods of competition and unfair, unconscionable, and unlawful practices. Defendant's wrongful conduct as alleged in this Class Action Complaint has had widespread impact on the public at large.

236. The above unfair, unconscionable, and unlawful practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

237. Defendant's actions and inactions in engaging in the unfair, unconscionable, and unlawful practices described herein were negligent, knowing and willful, and/or wanton and reckless.

238. Plaintiff and Class Members seek relief under NYGBL § 349, including, but not limited to, a declaratory judgment that Defendant's actions and/or practices violate NYGBL § 349; injunctive relief enjoining Defendant, their employees, parents, subsidiaries, affiliates, executives, and agents from continuing to violate NYGBL § 349 as described above.

239. Plaintiff and Class Members are also entitled to recover actual damages, to recover the costs of this action (including reasonable attorneys' fees), and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of themselves and Class Members, requests judgment against Defendant and that the Court grant the following:

(a) For an Order certifying the Class and appointing Plaintiff and Counsel to represent such Class;

(b) For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

(c) For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

(d) For an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

(e) For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

(f) For prejudgment interest on all amounts awarded; and

(g) Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

DATE: September 29, 2026 Respectfully Submitted,

*/s/ Alexandra Mormile*
Alexandra Mormile (NY Bar No. 5718259)
Leanna A. Loginov (NY Bar No. 5894753)
**SHAMIS & GENTILE, P.A.**
14 NE First Avenue, Suite 705
Miami, Florida 33132
T: 305-479-2299
lloginov@shamisgentile.com
amormile@shamisgentile.com

Randi Kassan, Esq.
**MILBERG PLLC**
100 Garden City Plaza, Suite 408
Garden City, NY 11530
T: 516-741-5600
Rkassan@milberg.com

Alex Honeycutt*
**MILBERG PLLC**
800 S. Gay Street, Suite 100
Knoxville, TN 37929
Tel: (865) 263-8384
ahoneycutt@milberg.com

***Counsel for Plaintiff and the Putative Class***

* *pro hac vice* forthcoming